FILED
2026 Sep-30 PM 03:30
U.S. DISTRICT COURT
N.D. OF ALABAMA

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| LESTER LOVELADY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 2:24-cv-01650-NAD |
| | ) | |
| CSX TRANSPORTATION, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

For the reasons stated below, and on the record in the telephonic, oral argument motion hearing, the court **GRANTS** Defendant CSX Transportation, Inc.'s motion for summary judgment (Doc. 168). The court separately will enter final judgment.

## BACKGROUND

### A. Procedural background

On March 13, 2018, twenty individual named plaintiffs, including Plaintiff Nathan Dove, filed a complaint against Defendant CSX, on behalf of themselves and others similarly situated, in the United States District Court for the District of Maryland. Doc. 1; *see Bell, et al v. CSX Transp., Inc.*, No. 1:18-cv-00744-JKB (D. Md.). In the complaint, the plaintiffs alleged that CSX, a railroad operator and their employer, violated their rights under the Family Medical Leave Act (FMLA), 29

U.S.C. § 2601, et seq. On April 23, 2024 (with leave of that court, *see* Doc. 103), the plaintiffs filed a first amended complaint that included Plaintiffs Jeremy D. Johnson and Lester Lovelady. Doc. 104. On November 26, 2024, the Maryland district court entered a memorandum opinion and order transferring the cases of all non-Maryland plaintiffs to their home districts. Doc. 128; Doc. 129. On November 27, 2024, the claims brought by Plaintiffs Dove, Johnson, and Lovelady were transferred to this court. Doc. 130; *see* Doc. 129 at 1.

On January 17, 2025, Plaintiffs Dove, Johnson, and Lovelady filed an amended complaint against CSX, limited to their own claims. Doc. 143. In that amended complaint, Plaintiffs alleged that CSX "engaged in a brazen pattern and practice of unlawfully discouraging FMLA leave and retaliating against workers who rely on the FMLA's protections." Doc. 143 at 1. Plaintiffs alleged that CSX violated the FMLA by instituting an attendance policy that punished employees for taking FMLA leave, and by improperly terminating or suspending employees who CSX alleged fraudulently had misused their FMLA leave. Doc. 143 at 1–6. Plaintiffs alleged two claims for relief: (1) FMLA interference, and (2) FMLA discrimination.[1] Doc. 143 at 10–12.

---

[1] In the briefing on this summary judgment motion, both parties characterize and address this claim for discrimination as a claim for retaliation. *See* Doc. 169; Doc. 172; Doc. 174. So, consistent with the FMLA, this court will do the same. *See infra* Legal background.

On January 31, 2025, CSX filed an amended answer. Doc. 146. The parties consented to magistrate judge jurisdiction. Doc. 147; 21 U.S.C. § 636(c); Fed. R. Civ. P. 73.

On March 3, 2025, the parties jointly stipulated to the dismissal of all claims based on the CSX attendance policy. Doc. 152. The parties then filed a motion for referral to mediation (Doc. 161), which the court granted (Doc. 162). At mediation, the parties resolved the claims brought by Plaintiffs Dove and Johnson. *See* Doc. 169 at 6 n.1.

On February 26, 2026, CSX filed this summary judgment motion on Plaintiff Lovelady's claims. Doc. 168; *see* Doc. 169 (supporting brief); Doc. 170 (evidentiary material). On March 20, 2026, Lovelady filed his opposition (Doc. 172), followed by a notice of supplemental authority (Doc. 173). And, on April 3, 2026, CSX filed its reply. Doc. 174.

On June 10, 2026, the court held a telephonic, oral argument motion hearing. *See* minute entry, entered: 06/10/2016; Doc. 175 (order setting hearing).

In July and August, 2026, the parties filed a series of notices of supplemental authority and responses thereto—with the most recent such filing on August 21, 2026. Doc. 176; Doc. 177; Doc. 178; Doc. 179; Doc. 180.

**B. Factual background**

Lovelady alleged that he was wrongfully terminated for taking FMLA leave,

including around Christmas 2017. On this summary judgment motion, the following record facts are undisputed:

CSX is a freight railroad operator with approximately 23,000 employees. Doc. 170-8 at 1. Lovelady worked for CSX in its Train and Engine Service from 2011 to 2017, and was an engineer at all relevant times. Doc. 170-1 at 4; *see* Doc. 170-20 at 13.

**1. CSX's FMLA "system"**

CSX employees are not allowed to take FMLA leave to avoid working on holidays or weekends. Doc. 170-1 at 10.

CSX Operating Rule 104.2 forbids employee dishonesty. Doc. 170-22 at 25. CSX policy classifies dishonesty as a major offense warranting removal from service prior to a hearing. Doc. 170-21 at 2.

Jolanda Johnson, a senior benefits manager at CSX who administered CSX's FMLA policy, testified in her deposition that, in 2016, she and CSX Labor Relations developed a system that uses technology to flag patterns of FMLA use that might suggest misuse; any flagged patterns then are reported to Johnson. Doc. 170-8 at 1; Doc. 170-20 at 11–12 (Johnson Depo.). Prior to 2016, all flagging of potential FMLA misuse was handled manually. Doc. 170-20 at 12.

The system was put in place in part because various people working in operations at CSX had voiced to Johnson that the use of FMLA leave was affecting

employee availability to work. Doc. 170-20 at 13. The new FMLA system resulted from a spike in FMLA leave after a new attendance policy was put in place. Doc. 170-20 at 13–14. On August 31, 2016, CSX sent out a bulletin about FMLA misuse. Doc. 170-22 at 14. CSX sent out additional bulletins about FMLA misuse on December 20, 2016, and November 21, 2017. Doc. 170-22 at 16–19.

CSX has a third-party vendor that handles the general administration of FMLA requests, and Johnson herself only reviews FMLA issues that the third-party administrator escalates to her at CSX. Doc. 170-20 at 10. Johnson reviews trends around patterns of FMLA use or misuse. Doc. 170-20 at 10. The automated process flags employees who have used FMLA to extend time off, or on weekends or holidays, 4 or more times in the last 12 weeks. Doc. 170-20 at 16. Even with the automated process flagging FMLA use patterns, "before an employee is charged with FMLA misuse, an individualized review is completed." Doc. 170-20 at 14.

To conduct individualized investigations after a pattern of potential FMLA misuse had been flagged, Johnson would "[r]eview the medical information, review the absences that have been identified as pattern use and the statuses of those absences," and "[r]eview to determine if [CSX] ha[s] any documentation to support the pattern use." Doc. 170-20 at 22. Sometimes investigations would include looking at social media or occasionally using a private investigator, though Johnson was not responsible for the decision on whether to involve a private investigator.

Doc. 170-20 at 22.

The automated process was not used to decide whether to terminate employees because "the intent is not to fire employees. And so with this process . . . employees are notified. . . . it's not discipline." Doc. 170-20 at 23. Where "the employee has been identified by the system," it still "[i]s possible that [CSX] ha[s] information that justifies the employee's pattern use." Doc. 170-20 at 23. CSX generally does not reach out to employees' doctors during investigations for FMLA misuse, but the employees being investigated can reach out to their doctors. Doc. 170-20 at 23–24.

If Johnson does an individualized assessment and suspects FMLA misuse, the first step is a warning letter, followed by continued monitoring; if the employee continues to show a pattern of potential misuse, a final warning letter is issued. Doc. 170-20 at 26–27. The warning letters are meant to be "corrective," not disciplinary. Doc. 170-20 at 27.

### 2. Lovelady's FMLA use, and two warning letters before Christmas 2017 (August 2016 and February 2017)

In 2017, Lovelady was working an "on call" schedule, pursuant to which he was essentially on-call to come in to work 24 hours per day, 7 days per week, including weekends and holidays. Doc. 170-1 at 5; *see* Doc. 170-15 at 2–3.

Lovelady was approved for FMLA leave from about 2015 through 2017, based on his ADHD. Doc. 170-1 at 7.

With respect to Christmas 2017, Lovelady had FMLA approval from September 2017 through September 2018, for 3 episodes per month of leave with up to 2 days of leave per episode, as well as 4 to 6 office visits per year, with 12 weeks maximum for FMLA leave per year. Doc. 170-22 at 4.

The FMLA approval for Lovelady stated that misusing FMLA leave, including a pattern of using FMLA leave to extend time off or have time off on holidays or weekends could result in discipline. Doc. 170-22 at 5, 10.

Lovelady testified in his deposition that, when he marked off under FMLA leave for his ADHD, he would treat his symptoms—which included trouble functioning and forgetfulness—by relaxing at home and sleeping. Doc. 170-1 at 9 (Lovelady Depo.). Lovelady also took Adderall for his ADHD. Doc. 170-1 at 8. Lovelady testified that not getting enough sleep, having an unpredictable schedule, eating certain foods, and getting upset could be triggers for his ADHD, and that "[m]aybe stress" would cause his ADHD to be worse around the holidays. Doc. 170-1 at 9.

Before Christmas 2017, Lovelady had received two warning letters about what CSX believed to be his apparent misuse of FMLA: The first in August 2016, and the second in February 2017. Doc. 170-1 at 16–17; *see* Doc. 170-5 at 1; Doc. 170-6 at 1.

First, the August 2016 warning letter addressed what CSX believed to be a

suspicious pattern of Lovelady's FMLA use that included mark-offs on the most recent New Year's Day, Martin Luther King Day weekend, and Easter Sunday, and included a list of several occasions on which Lovelady had taken FMLA leave on holidays or adjacent to rest days or vacation days. Doc. 170-5 at 1–3.

The August 2016 letter stated that it was based on a "review[]" of Lovelady's "work history," and that "[i]t appear[ed] that [Lovelady] [was] misusing FMLA leave as supported by [his] established pattern of marking off FMLA leave on the weekends or in conjunction with other days off (i.e., rest days, personal days, vacation, sick days)." Doc. 170-5 at 1.

The August 2016 letter also stated, "You are responsible for using FMLA leave for your approved use, as indicated in your approval letter. Additionally, you are responsible for complying with applicable call-in procedures. Any misuse of FMLA leave may subject you to handling under the Individual Development and Personal Accountability Policy (IDPAP) or applicable disciplinary and/or absenteeism policies." Doc. 170-5 at 1.

The August 2016 letter stated further that "[t]his warning letter is intended to be corrective in nature and is not considered formal discipline. However, in the event that your pattern usage continues and absent extenuating circumstances, you will be handled under the IDPAP." Doc. 170-5 at 1 (bold emphasis omitted). The letter also directed Lovelady to contact Johnson, "if [he] ha[d] questions about the

data provided" with respect to the mark-offs that CSX believed to show a suspicious pattern. Doc. 170-5 at 1; *see* Doc. 170-5 at 2–3.

Second, the February 2017 letter stated that it was a "final warning." Doc. 170-6 at 2 (bold emphasis omitted). The February 2017 letter stated that CSX "ha[d] reviewed [Lovelady's] work history," and "determin[ed] that [he] ha[d] not addressed the behaviors outlined in the warning letter previously sent to [him]." Doc. 170-6 at 2. The letter said that, "[b]ased on your work history, it appears that you continue to misuse FMLA leave, as supported by your established pattern of marking off FMLA leave on the weekends, in conjunction with other days off (i.e., rest days, vacation days, etc.), holidays or other pattern." Doc. 170-6 at 2.

The February 2017 letter attached a report that identified Lovelady's FMLA mark-offs at the end of 2016 and the beginning of 2017 for some or all of Christmas Eve, Christmas Day, New Year's Eve, New Year's Day, and the Martin Luther King Day weekend. Doc. 170-6 at 3.

The February 2017 letter stated, "You were previously advised in your FMLA approval letter and warning letter that misusing FMLA leave could result in disciplinary action. You were also advised that examples of misuse included using FMLA leave solely to avoid certain work assignments, to extend time off (e.g., next to rest days, vacation days, etc.), to be off on a holiday(s), a weekend(s), or to avoid working overtime." Doc. 170-6 at 2.

The February 2017 letter also stated, "This final warning letter is intended to be corrective in nature and is not considered formal discipline. However, if you continue misusing FMLA you may be subject to a charge and formal disciplinary handling. [CSX] will continue to monitor your FMLA mark offs." Doc. 170-6 at 2 (bold emphasis omitted).

The February 2017 letter stated further that, "[i]f there are extenuating circumstances that may support your pattern use described in this letter, you may provide Ms. Johnson with supporting documentation." Doc. 170-6 at 2.

Johnson had no record of Lovelady responding to either of these FMLA misuse warning letters. Doc. 170-8 at 3.

#### 3. Lovelady's FMLA use at Christmas 2017 (and Thanksgiving 2017 and Father's Day 2017)

Lovelady then marked off for FMLA leave around noon on Christmas Eve through Christmas Day 2017, as well as on Thanksgiving 2017 and Father's Day 2017. Doc. 170-1 at 11–13; Doc. 170-4 at 1. Lovelady also used FMLA leave on some days that were not holidays, and worked some holidays without using FMLA leave. *See* Doc. 172-2.

#### 4. FMLA use at CSX at Christmas 2017

Johnson submitted a declaration stating that "an abnormally large" number of CSX employees marked off for FMLA leave for Christmas 2017. Doc. 170-8 at 1. CSX submitted graphs showing the spikes in FMLA usage over the holidays. Doc.

170-22 at 20–21.

"Based on the sharp spike in FMLA usage," Johnson believed that some employees had misused FMLA leave and investigated the employees who had marked off by reviewing their recent leave history to look for patterns of marking off on holidays or special occasions. Doc. 170-8 at 2. For 2017, Johnson looked at Father's Day, the Fourth of July, Labor Day, Columbus Day, Halloween, Veterans Day, Thanksgiving, Black Friday, Christmas Eve, and Christmas Day; and, if an employee had marked off for at least 4 of the 10 holidays, "the employee was charged with dishonesty and removed from service pending a hearing, unless his or her medical condition in [Johnson's] opinion clearly explained the mark-offs." Doc. 170-8 at 2. "More than 1,000" employees used FMLA leave between December 22, 2017, and December 26, 2017; of those, 123 employees were charged with using FMLA leave dishonestly; and, of those, 81 were disciplined. Doc. 170-8 at 2.

Some employees were not disciplined after CSX's individualized investigation, because those employees provided some justification for their FMLA usage. Doc. 170-20 at 35.

**5. Lovelady's investigation, hearing, discipline, and arbitration**

Based on a review of Lovelady's leave history, "the timing of his markoff over Christmas, and the reason for which he had been approved for leave," Johnson "determined in consultation with Labor Relations and with the CSX Law

Department that Mr. Lovelady should be charged with misusing FMLA leave over Christmas 2017." Doc. 170-8 at 3.

On January 8, 2018, a letter was issued to Lovelady "to attend a formal investigation" on January 17, 2018, "to develop the facts and place [his] responsibility, if any, in connection with a review of [his] work history," in which "[he] misused FMLA leave between December 22, 2017, and December 26, 2017, and all circumstances thereto." Doc. 170-22 at 1; *see also* Doc. 170-22 at 3 (letter reissued on January 17, 2018).

On January 17, 2018, Martin White (an assistant regional superintendent at CSX) conducted a hearing on Lovelady's FMLA use and his charge of dishonesty, in which Lovelady was represented by Mike Stone (a union official). Doc. 170-1 at 17; *see* Doc. 170-3 at 1; Doc. 170-23 at 4–5. At Lovelady's hearing on his charge of misuse, Anita Tingley testified in Johnson's place as the CSX management representative. Doc. 170-8 at 46; Doc. 170-23 at 4–5. Tingley stated in a sworn declaration that, at the relevant time, she was a manager in CSX's field administration department. Doc. 170-12 at 1. She had access to Lovelady's work history and FMLA mark-offs for Thanksgiving and Christmas 2017. Doc. 170-12 at 1–2. Lovelady and Stone confirmed that they were prepared to proceed with the hearing. Doc. 170-23 at 5. Tingley and White operated off a standard script that was not provided to Stone and Lovelady. Doc. 170-20 at 153.

In the hearing, Tingley detailed Lovelady's holiday FMLA usage. Doc. 170-23 at 21–24.

Exhibit 5 in the hearing showed what CSX believed to be a suspicious pattern of Lovelady's FMLA use that included mark-offs on Father's Day 2017, Thanksgiving 2017, and Christmas Eve through Christmas Day 2017. Doc. 170-22 at 13; *see also, e.g.*, Doc. 170-23 at 26–29 (hearing testimony).

Stone, the union representative, asked if Tingley had any proof that Lovelady had misused FMLA leave other than the timing of his mark-offs, and she did not introduce additional evidence; Tingley relied on the pattern of days and times that Lovelady had marked off. Doc. 170-23 at 26–28.

At the hearing, Lovelady testified that, in 2017, he did not mark off Father's Day, Thanksgiving, Christmas Eve, or Christmas Day to avoid working those days. Doc. 170-23 at 30.

When asked, "what were you doing when you marked off" on FMLA leave for holidays, Lovelady stated only, "[u]sing FMLA the way it's prescribed." Doc. 170-23 at 30.

When asked if he had "received warning letters or other charge letters associated with FMLA" in the past two years, Lovelady said, "No." Doc. 170-23 at 31.

Lovelady testified that he never misused FMLA leave. Doc. 170-23 at 34, 37.

When asked if there was additional evidence that he would like to present at the hearing, or whether he would "care to make a statement on [his] own behalf," Lovelady said, "No." Doc. 170-23 at 37.

Lovelady acknowledged in his deposition in this case that he had the opportunity to introduce documents at the hearing, but that he did not do so. Doc. 170-1 at 17.

Stone, the union representative, made a statement in the hearing; Stone asserted that CSX had no proof of misuse, that FMLA leave taken on non-holidays had been excluded from the recitation of the alleged pattern of leave misuse, and that Lovelady was not required to submit medical evidence. Doc. 170-23 at 38.

After the hearing, Macon Jones, a labor relations manager, recommended that Lovelady be dismissed based on FMLA misuse (with respect to Christmas Eve, Christmas Day, Thanksgiving, and Father's Day 2017), finding FMLA misuse proven because Lovelady "was offered the opportunity to provide evidence he used FMLA legitimately," but "declined because he said the FMLA policy does not require evidence for mark offs." Doc. 170-25 at 1–2.

Jones also noted that Lovelady had received the two prior warning letters in August 2016 and February 2017, and that in the hearing Lovelady "responded no" when asked "if he had prior warning letters related to FMLA." Doc. 170-25 at 1.

Jones stated in an email that, "[b]ased on the facts, we have proven the charge

of FMLA misuse and considering the two prior FMLA warning letters, dismissal would be appropriate." Doc. 170-25 at 1.

On February 16, 2018, a letter was issued to Lovelady stating that, "as a result of the testimony and other evidence presented in this investigation," he was being dismissed effective immediately for violating CSX Operating Rule 104.2, which prohibits dishonesty, by misusing FMLA leave. Doc. 170-7 at 1; *see* Doc. 170-1 at 18.

Lovelady made a claim for reinstatement to a neutral arbitration board (the National Railroad Adjustment Board), but his claim was denied. Doc. 170-26. The National Railroad Adjustment Board found that substantial evidence supported CSX's determination that Lovelady had misused FMLA leave. Doc. 170-26 at 4.

The arbitration award denial stated that, "[f]ollowing a formal Investigation, [Lovelady] was dismissed from service for misusing FMLA leave between December 22 and 26, 2017. The record reflects that [Lovelady] marked off for FMLA leave from 12:28 P.M. on December 24, until 1:20 A.M. on December 26, 2017. [Lovelady] provided no explanation or documentation to support his need to take FMLA leave on that date. During 2017, [Lovelady] had used FMLA leave on New Year's Day (having started the leave on New Year's Eve), Martin Luther King, Jr. Day and from the day before Thanksgiving until the day after Thanksgiving. His use of FMLA leave in 2016 had also included five holidays." Doc. 170-26 at 4.

The arbitration award denial also stated that the "Board is satisfied that [CSX] established that [Lovelady] had a pattern of FMLA use in connection with holidays, thereby creating the presumption that his use of leave on this holiday might not have been related to his FMLA leave approval." Doc. 170-26 at 4.

### C. Legal background

"The FMLA grants eligible employees a series of entitlements, among them the right to 'a total of 12 workweeks of leave during any 12-month period' for a number of reasons, including 'a serious health condition that makes the employee unable to perform the functions of the position of such employee.'" *Jones v. Gulf Coast Health Care of Delaware, LLC*, 854 F.3d 1261, 1267 (11th Cir. 2017) (quoting 29 U.S.C. § 2612(a)(1)(D)). "To preserve and enforce these rights, 'the FMLA creates two types of claims: interference claims, in which an employee asserts that his employer denied or otherwise interfered with his substantive rights under the Act, and retaliation claims, in which an employee asserts that his employer discriminated against him because he engaged in activity protected by the Act.'" *Id.* (quoting *Strickland v. Water Works & Sewer Bd. of City of Birmingham*, 239 F.3d 1199, 1206 (11th Cir. 2001) (cleaned up)).

"The FMLA prohibits employers from retaliating against employees for engaging in protected activities." *Munoz v. Selig Enters., Inc.*, 981 F.3d 1265, 1275 (11th Cir. 2020).

In the absence of direct evidence of retaliation, FMLA retaliation claims long have been analyzed under "the burden-shifting framework articulated" in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Munoz*, 981 F.3d at 1275; *see Schaaf v. Smithkline Beecham Corp.*, 602 F.3d 1236, 1243 (11th Cir. 2010).

"Under the *McDonnell Douglas* framework, the plaintiff bears the initial burden of establishing a prima facie case of retaliation." *Lapham v. Walgreen Co.*, 88 F.4th 879, 889 (11th Cir. 2023). "If the plaintiff makes that initial showing, the burden next 'shifts to the defendant to proffer a legitimate reason for the adverse action' taken against the plaintiff." *Id.* (quoting *McAlpin v. Sneads*, 61 F.4th 916, 927 (11th Cir. 2023)). "This responsive burden is a simple burden of production that can involve no credibility assessment." *Id.* (quotation marks omitted). If the defendant meets that burden, the "burden then shifts back to the plaintiff to prove by a preponderance of the evidence that the legitimate reason is merely pretext for prohibited, retaliatory conduct," such that the plaintiff "bears the ultimate burden of persuasion." *Id.* (quotation marks omitted).

Importantly, a plaintiff "is not allowed to recast an employer's proffered nondiscriminatory reasons or substitute his business judgment for that of the employer." *Chapman v. AI Transp.*, 229 F.3d 1012, 1030 (11th Cir. 2000) (*McDonnell Douglas* analysis in the context of a claim under the Age Discrimination in Employment Act (ADEA)). "Provided that the proffered reason is one that might

motivate a reasonable employer," the plaintiff "employee must meet that reason head on and rebut it," and the "employee cannot succeed by simply quarreling with the wisdom of that reason." *Id.* (citation omitted).

In this regard, to "show pretext, an employee must introduce evidence 'sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision.'" *Munoz*, 981 F.3d at 1277 (quoting *Jones*, 854 F.3d at 1274). "A showing of pretext arises from 'weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action.'" *Id.* (quoting *Jones*, 854 F.3d at 1274).

Moreover, a defendant employer can overcome an assertion of pretext by showing a "good faith belief" that the plaintiff employee committed misconduct. *E.E.O.C. v. Total Sys. Servs., Inc.*, 221 F.3d 1171, 1176–77 (11th Cir. 2000); *see also Godwin v. Corizon Health*, 732 F. App'x 805, 807 (11th Cir. 2018) ("an employer can hardly be said to have retaliated against an employee if it terminated the employee based on a good faith belief that [he] violated a rule, even if the purported violation never actually occurred"); *Thomas v. Dolgencorp, LLC*, 645 F. App'x 948, 951 (11th Cir. 2016) ("An employer is entitled to rely on a good faith belief that an employee has committed professional misconduct and does not need to prove that belief was correct.").

In assessing pretext in a retaliation or discrimination case involving alleged employee misconduct, the question is not whether the employee actually committed the misconduct, but whether the employer reasonably *believed* that the employee committed the misconduct. *See Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991) ("The inquiry of the ADEA is limited to whether [the employer] *believed* that [the employee] was guilty of harassment, and if so, whether this belief was the reason behind [the employee's] discharge." (emphasis in original)); *see also Alvarez v. Royal Atl. Devs., Inc.*, 610 F.3d 1253, 1266 (11th Cir. 2010) ("The inquiry into pretext centers on the employer's beliefs, not the employee's beliefs and, to be blunt about it, not on reality as it exists outside of the decision maker's head.").

More recently, the Eleventh Circuit has instructed that a plaintiff "must be afforded the opportunity to confront [his] burden of proof head-on, if [he] so chooses," and that the "convincing mosaic standard heeds this directive and preserves the plaintiff's opportunity at summary judgment to directly create an inference of discrimination or retaliation—shorn of all the *McDonnell Douglas* prophylaxis." *Ismael v. Roundtree*, 161 F.4th 752, 763 (11th Cir. 2025) (citation omitted; cleaned up). According to the Eleventh Circuit, "summary judgment should not be granted for failure to demonstrate pretext unless it also reflects a failure to put forward enough evidence for a jury to find for the plaintiff on the ultimate question of discrimination or retaliation." *Id.* (citation and quotation marks omitted).

Generally speaking, the federal courts "do not sit as a 'super-personnel department,' and it is not [the courts'] role to second-guess the wisdom of an employer's business decisions—indeed the wisdom of them is irrelevant—as long as those decisions were not made with a discriminatory motive." *Alvarez*, 610 F.3d at 1266 (quoting *Chapman*, 229 F.3d at 1030).

**LEGAL STANDARD**

Summary judgment is appropriate when the movant establishes that "there is no genuine dispute as to any material fact," and that the movant "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A material fact is one that might affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).[2] And a dispute about a material fact is "genuine," if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

To avoid summary judgment, the nonmovant must go beyond the allegations to offer specific facts creating a genuine dispute for trial. *Celotex*, 477 U.S. at 324–

[2] *Accord, e.g.*, *Celotex*, 477 U.S. at 322–23 ("[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.").

25. The court's responsibility is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. The court must construe all evidence and draw all reasonable inferences in the nonmovant's favor. *Centurion Air Cargo, Inc. v. UPS Co.*, 420 F.3d 1146, 1149 (11th Cir. 2005).

Where there is no genuine dispute of material fact for trial, the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a), (c).

## DISCUSSION

As noted above, this action is part of a constellation of cases in which former CSX employees have alleged that they were wrongfully terminated for taking FMLA leave. Notwithstanding what any other court may have said in any of those other cases (and as this court has discussed with the parties in this case), this court remains of the firm belief that each of these cases must be decided on its own particular set of facts. Nothing in the record could support a finding that CSX's so-called FMLA "system" and investigatory processes were so flawless as to immunize CSX from trial in *every* such case, where a reasonable jury could find or infer retaliation as to that particular plaintiff. Nor can it be that the plaintiff employee in *every* case can get to the jury, just by criticizing certain aspects of CSX's FMLA system or investigatory processes. So, Lovelady's case must be decided on its own facts. And those facts include CSX's individualized review and investigation that were specific

to Lovelady.

Here, based on the undisputed record facts in this case (and this case alone), and the controlling Eleventh Circuit law, there is no genuine dispute of material fact for trial, and CSX is entitled to judgment as a matter of law. Construing all of the evidence and reasonable inferences in Lovelady's favor, the evidence that Lovelady has identified as to CSX's FMLA system does not "meet . . . head on" and does not "rebut" CSX's proffered nondiscriminatory reason for his termination—i.e., the dishonesty charge based on CSX's good faith belief that Lovelady had misused his FMLA leave. *See Chapman*, 229 F.3d at 1030 (citation omitted). Likewise, given the undisputed record facts regarding CSX's individualized review and investigation into Lovelady's FMLA use, all of which support CSX's good faith belief that Lovelady had misused his FMLA leave, Lovelady has not "confront[ed] [his] burden of proof head-on." *See Ismael*, 161 F.4th at 763 (citation and quotation marks omitted); *see also Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005) (jury speculation "does not meet a party's burden of producing some defense to a summary judgment motion" because "[s]peculation does not create a *genuine* issue of fact" (emphasis in original; citation and quotation marks omitted)).

## I. There is no genuine dispute of material fact for trial on Lovelady's FMLA retaliation claim.

There is no genuine issue of material fact for trial on Lovelady's FMLA retaliation claim. CSX argues that it is entitled to summary judgment because it "has

articulated a legitimate, nondiscriminatory reason for [Lovelady's] discipline (i.e., the Company's good-faith belief that he had used FMLA leave dishonestly), which Lovelady cannot show is pretextual." Doc. 169 at 16. In opposition, Lovelady does not argue that there was direct evidence of retaliation in this case. *See* Doc. 172 at 13–21. So—consistent with the party presentation principle,[3] the parties' briefing, and the parties' arguments—the court here is guided by the *McDonnell Douglas* burden-shifting framework, at least initially. *See Schaaf*, 602 F.3d at 1243. *But see Ismael*, 161 F.4th at 763 (*supra* Legal Standard). In this regard, CSX nowhere argues that Lovelady cannot establish a prima facie case of retaliation/discrimination.[4]

Whatever is left of the *McDonnell Douglas* framework, the determinative issue is whether there is "enough evidence for a jury to find for [Lovelady] on the

---

[3] *See, e.g.*, *United States v. Campbell*, 26 F.4th 860, 872 (11th Cir. 2022) (courts "rely on the parties to frame the issues for decision and assign to courts the role of neutral arbiter of matters the parties present" (quoting *United States v. Sineneng-Smith*, 590 U.S. 371, 375 (2020)).

[4] *See, e.g.*, Doc. 169 at 16–17 ("Here, even assuming that Lovelady can make out a prima facie case, his retaliation claim fails because CSX has articulated a legitimate, non-discriminatory reason for his discipline—his dishonest use of FMLA leave—and Lovelady cannot show that it is pretext for retaliation."); *see also Thomas*, 645 F. App'x at 951 ("Where the defendant has met its burden of articulating a legitimate, non-discriminatory reason for its action, we may assume without deciding that the plaintiff has established a prima facie case and decide the case on the question of pretext." (citing *Holifield v. Reno*, 115 F.3d 1555, 1564 (1997); *Wascura v. City of S. Miami*, 257 F.3d 1238, 1243 (11th Cir. 2001)).

ultimate question of discrimination or retaliation." *Ismael*, 161 F.4th at 763 (citation and quotation marks omitted). In light of the undisputed record evidence regarding CSX's individualized review and investigation into what it believed to be Lovelady's dishonest FMLA misuse, there is not.

CSX argues that it honestly believed that Lovelady had misused FMLA leave to avoid holiday work (Doc. 169 at 17), and the undisputed record facts show that Lovelady received a letter in February 2018 stating that he was being terminated based on a determination that he had violated company policy by dishonestly misusing FMLA leave (Doc. 170-7 at 1; Doc. 170-1 at 18). Thus, CSX has presented evidence that Lovelady was terminated for violating company policy, not solely for using FMLA leave—though, to be sure (practically speaking), an employee's predicate *use* of FMLA leave is implicated in any employer's assertion of dishonesty based on FMLA *misuse*. *See Total Sys. Servs.*, 221 F.3d at 1176.

As explained above, the undisputed record evidence shows that Lovelady marked off for FMLA leave for Christmas Eve and Christmas Day in 2017, as well as Thanksgiving 2017 and Father's Day 2017. Doc. 170-1 at 11–13; Doc. 170-4 at 1.

After a large spike in FMLA use over the Christmas 2017 holiday (involving more than 1,000 CSX employees), Johnson subjected Lovelady's FMLA use to an individualized review and investigation; and, based on the undisputed fact that

Lovelady had taken FMLA leave on several holidays in 2017 (e.g., Christmas Eve, Christmas Day, Thanksgiving, and Father's Day), Lovelady was charged with dishonesty and removed from service pending a hearing. Doc. 170-8 at 1–2; Doc. 170-8 at 3.

In January 2018, a hearing then was conducted on the charge of dishonesty against Lovelady and his charged FMLA misuse, and at the hearing Lovelady was asked if he marked off to avoid working on holidays; Lovelady said no. Doc. 170-23 at 30. When asked what he was doing when he marked off on those holidays, Lovelady stated only that he was "[u]sing FMLA the way it's prescribed." Doc. 170-23 at 30.

But, aside from these blanket denials, Lovelady gave no explanation and did not say anything at the hearing about his ADHD or why he would have needed to treat any symptoms on FMLA leave around those holidays.

Lovelady was given the opportunity at the hearing to make a statement on his own behalf and to introduce evidence, but he declined to do so. Doc. 170-23 at 37; Doc. 170-1 at 17.

In addition, Lovelady previously had received two warning letters—in August 2016 and February 2017—about what CSX believed to be his pattern of suspicious FMLA use around the holidays. Doc. 170-1 at 16–17; *see* Doc. 170-5 at 1; Doc. 170-5 at 2–3; Doc. 170-6 at 2.

The August 2016 warning letter related to Lovelady's FMLA use that included mark-offs in 2016 on New Year's Day, the Martin Luther King Day weekend, and Easter Sunday, among other holidays, and leave adjacent to rest days or vacation days. *See, e.g.*, Doc. 170-5 at 1–3.

And the February 2017 final warning letter related to Lovelady's FMLA mark-offs at the end of 2016 and the beginning of 2017 for Christmas Eve, Christmas Day, New Year's Eve, New Year's Day, and the Martin Luther King Day weekend. *See, e.g.*, Doc. 170-6 at 3.

There is no record evidence that Lovelady responded to either of these FMLA misuse warning letters. *See* Doc. 170-8 at 3.

Furthermore, when asked in the January 2018 hearing whether he previously had received any warning letters associated with FMLA leave, Lovelady said no. Doc. 170-23 at 31.

Jones then recommended dismissal based on FMLA misuse because—despite the opportunity to do so—Lovelady had provided no evidence that he had used FMLA leave legitimately, and in light of the two prior warning letters. Doc. 170-25 at 1–2.

Lovelady's termination then was sustained after a neutral arbitration based on findings that he had "marked off for FMLA leave from 12:28 P.M. on December 24, until 1:20 A.M. on December 26, 2017," and had "provided no explanation or

documentation to support his need to take FMLA leave on that date," that, "[d]uring 2017, [he] had used FMLA leave on New Year's Day (having started the leave on New Year's Eve), Martin Luther King, Jr. Day and from the day before Thanksgiving until the day after Thanksgiving," that "[h]is use of FMLA leave in 2016 had also included five holidays," that CSX had "established that [he] had a pattern of FMLA use in connection with holidays," and that "his use of leave on this [Christmas 2017] holiday might not have been related to his FMLA leave approval." Doc. 170-26 at 4.

For sake of clarity, on these undisputed record facts, the question isn't whether a jury reasonably could find or infer that Lovelady did *not* actually misuse his FMLA leave. *See, e.g.*, *Elrod*, 939 F.2d at 1470. Instead, the question is whether a reasonable jury could find or infer that CSX did *not* have a good faith belief that Lovelady dishonestly had misused his FMLA leave, as CSX had charged him. *See id.*; *Alvarez*, 610 F.3d at 1266.

Here, Lovelady had several opportunities to dissuade CSX from its belief that he had engaged in a suspicious pattern of FMLA use around the holidays. But, here, where Lovelady did nothing—at the time—to call into question CSX's belief that he had misused FMLA leave, the record cannot support a reasonable finding or inference that CSX had anything other than a good faith belief that he had engaged in the charged dishonesty. *See, e.g.*, *Total Sys. Servs.*, 221 F.3d at 1176–77. Stated

otherwise, there is not "evidence sufficient to permit a reasonable factfinder to conclude that the reasons given by [CSX] were not the real reasons for the adverse employment decision." *Munoz*, 981 F.3d at 1277 (citation and quotation marks omitted).

This court can "not sit as a 'super-personnel department.'" *Alvarez*, 610 F.3d at 1266 (quoting *Chapman*, 229 F.3d at 1030). Nor could a jury.

This is not a case where, upon being individually investigated for charged FMLA misuse, Lovelady took the opportunities he was given and presented even a cursory explanation of why he had marked off on or around the relevant holidays.[5] While Lovelady testified in his deposition in this case—in September 2018—that his ADHD could flare up over the holidays on account of "[m]aybe stress" (*see* Doc.

[5] As discussed above, given the undisputed facts as to CSX's individualized review and investigation into what it believed to be Lovelady's suspicious pattern of FMLA misuse, the court wonders about the utility of comparing and contrasting this case to any other in the array of cases challenging CSX's FMLA system and investigative processes. *See supra*. Nevertheless, here, a brief comparison to *Parker* and *Brown* is instructive. *See Parker v. CSX Transp., Inc.*, No. 2:18-cv-00274, 2021 WL 3022703 (N.D. Ala. July 16, 2021); *Brown v. CSX Transp., Inc.*, No. 8:24-cv-2777-VMC-LSG, 2026 WL 178735 (M.D. Fla. Jan. 23, 2026). In *Parker*, the plaintiff stated at his hearing that he had been with his wife at the hospital when he took FMLA leave over the holidays. *Parker*, 2021 WL 3022703, at *7. In *Brown*, the plaintiff likewise provided an explanation for his leave, stating that he was not in a state to be working that day due to personal issues. *Brown*, 2026 WL 178735, at *5. Unlike Lovelady, in *Parker* and *Brown*, both plaintiffs provided some explanation for their use of FMLA leave, calling into doubt CSX's presumptions based on the apparently suspicious timing of their absences. In this case, there is no such explanation or basis to doubt CSX's good faith belief about Lovelady's charged FMLA misuse.

170-1 at 9), he provided no such explanation or information at or before his disciplinary hearing in January 2018 (*see* Doc. 170-23 at 30), or before his dismissal for dishonesty in February 2018.

In the January 2018 hearing, Lovelady had the opportunity, but gave no explanation at all and made no statement on his own behalf. Doc. 170-23 at 10, 37; Doc. 170-1 at 17.

Lovelady also answered untruthfully when asked in the January 2018 hearing if he previously had received any warning letters about FMLA misuse; as detailed above, he had received two such warning letters, in August 2016 and February 2017, and there is no record evidence that Lovelady had responded at all to either of those previous warning letters. *See, e.g.*, Doc. 170-23 at 31; Doc. 170-1 at 16–17; Doc. 170-5 at 1; Doc. 170-5 at 2–3; Doc. 170-6 at 2; Doc. 170-8 at 3.

Moreover, there can be no genuine issue of material fact or credibility issue based on Tingley's testimony in the January 2018 hearing that "it's possible" Lovelady appropriately had marked off for FMLA leave at Christmas 2017. *See* Doc. 172 at 17; Doc. 170-23 at 27. The question again is not whether Lovelady actually misused his FMLA leave, but whether there is any basis for a finding or inference that CSX did not have a good faith belief that Lovelady dishonestly had misused his leave. Read in context, Tingley's testimony confirms CSX's honest belief that Lovelady had misused his FMLA leave. Tingley testified in the January

2018 hearing, "It's possible that he was [appropriately marked off], but based on the facts surrounding the FMLA usage that occurred on December 24th and December 25th, [2017,] it's clear that [he] used it to avoid working." Doc. 170-23 at 27; *see* Doc. 170-23 at 27–28 (similar).

Nor can there be any genuine issue of material fact or credibility issue based on Lovelady's testimony from the January 2018 hearing in which he denied that he marked off to avoid working on holidays (Doc. 170-23 at 30), and said that he instead was "[u]sing FMLA the way it's prescribed" (Doc. 170-23 at 30). No reasonable jury could find or infer that anything in those blanket denials gave CSX any reason to doubt its belief that Lovelady had engaged in a pattern of dishonesty and FMLA misuse around the holidays—particularly where Lovelady also denied having received the two prior warning letters in August 2016 and February 2017. An employer's honest belief does not require an employee's confession. And, in this regard, everyone agrees that Lovelady was not required to provide medical records to substantiate his FMLA leave on or around holidays. *See* Doc. 172 at 18; Doc. 174 at 14. But Lovelady had been charged with dishonesty in connection with his FMLA use around the holidays, and to create a triable fact issue there does need to be some basis for a jury to find or infer that CSX did not have a good faith belief that Lovelady had misused his FMLA leave—that is, some reason for a jury to doubt CSX's belief that Lovelady dishonestly had been misusing FMLA leave. Given CSX's

individualized review and investigation into Lovelady's FMLA use around the holidays, here there is none—no "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in CSX's dishonesty-based charge and termination (*see Munoz*, 981 F.3d at 1277 (citation and quotation marks omitted)); and, absent speculation, not "enough evidence for a jury to find for [Lovelady] on the ultimate question of discrimination or retaliation" (*see Ismael*, 161 F.4th at 763 (citation and quotation marks omitted)).

In opposition, Lovelady argues that CSX's proffered, nondiscriminatory reason for terminating him was pretextual. *See, e.g.*, Doc. 172 at 13–21. Lovelady focuses primarily on CSX's FMLA system and investigatory processes, and asserts that "flaws in CSX's process preclude CSX from demonstrating it reasonably relied on that process." Doc. 172 at 13 (citing *Parker v. CSX Transp., Inc.*, No. 2:18-cv-00274, 2021 WL 3022703, at *14 (N.D. Ala. July 16, 2021); *Brown v. CSX Transp., Inc.*, No. 8:24-cv-2777-VMC-LSG, 2026 WL 178735 (M.D. Fla. Jan. 23, 2026)).

But, with respect to Lovelady (alone), CSX's good faith belief in his dishonesty-based FMLA misuse was not based just on its initial flagging or screening system and process, but also on its subsequent, individualized review, monitoring, investigation, charge, and hearing. And, nothing in that generalized argument or evidence as to CSX's system or process "meet[s] . . . head on" or "rebut[s]" the undisputed evidence—in this case—that CSX honestly believed that

Lovelady had misused his FMLA leave (*see Chapman*, 229 F.3d at 1030 (citation omitted)), or otherwise provides a basis for a reasonable jury to find or infer that CSX's honest belief that Lovelady had misused his FMLA leave "[was] not the real reason[]" for his dishonesty-based charge and termination (*see Munoz*, 981 F.3d at 1277 (citation and quotation marks omitted)). Given the undisputed, case-specific record evidence as to CSX's individualized review and investigation into Lovelady's FMLA use, and Lovelady's total lack of explanation for his holiday mark-offs (despite the several opportunities to explain away the charged dishonesty), this generalized, system-based argument and evidence does not "confront [his] burden of proof head-on." *See Ismael*, 161 F.4th at 763 (citation and quotation marks omitted).

Lovelady argues that, under Eleventh Circuit law, "[t]he key inquiry is whether the employer made a reasonably informed and considered decision before taking an adverse employment action." *Lowe v. Alabama Power Co.*, 244 F.3d 1305, 1308 (11th Cir. 2001); *see* Doc. 172 at 13 (quoting *Lowe*, 244 F.3d at 1308). But *Lowe* analyzed the prohibition under the Americans with Disabilities Act (ADA) against medical limitations that are not based on "particularized facts" and "objective, medical evidence," and instead are based on "stereotype[s]" and "unfounded fear." *Id.* Applying that reasoning here, the only evidence is that—after an individualized review and investigation—CSX made a "reasonably informed and

considered decision" based on the "particularized facts" of Lovelady's charged FMLA misuse. *See id.*

Lovelady also argues that "an employer cannot establish an 'honest belief' defense where there is a 'lack of evidence of significant investigation' by the employer," relying on *Roberts v. Rayonier, Inc.*, 135 F. App'x 351, 360 (11th Cir. 2005). *See* Doc. 172 at 13 (quoting *Roberts*, 135 F. App'x at 360). But that argument appears to overextend *Roberts*, which is unpublished, and in which the defendant employer's "apparent lack of follow-up" was only one aspect of the evidentiary record that made summary judgment inappropriate. *See Roberts*, 135 F. App'x at 359–60.[6] In any event, the undisputed evidence is that CSX monitored and repeatedly followed up on what it believed to be a suspicious pattern of Lovelady's FMLA misuse that included mark-offs on or around several holidays in 2016 and

[6] In *Roberts*, summary judgment was reversed because there were genuine disputes of material fact as to whether the defendant employer had terminated the plaintiff employee based on its honest belief that the plaintiff supposedly had made disclosures of confidential information. *See* 135 F. App'x at 359–60. The evidence was sufficient for the plaintiff to avoid summary judgment because, among other things, the termination letter was ambiguous as to the supposed disclosures of confidential information, another employee's testimony about the reasons for the plaintiff's termination did not include any mention of the disclosures of confidential information, the defendant employer's statements at an unemployment benefits proceeding emphasized other issues rather than the disclosures of confidential information, the defendant "ha[d] not pointed to any evidence indicating that it ever sought to determine . . . the substance of the [confidential] information" that the plaintiff supposedly had "disclosed," and because of the defendant's "apparent lack of follow-up" with regard to the supposed disclosures of confidential information. *See id.*

2017 (*see supra*), the monitoring and follow-up included two warning letters, a formal charge letter and a hearing, and Lovelady's termination later was sustained after a neutral arbitration.

Irrespective of how or why Lovelady was flagged or screened for potential FMLA misuse in CSX's system, the undisputed evidence shows what followed: an individualized review, monitoring, investigation, charge, hearing, termination, and neutral arbitration. *See, e.g.*, Doc. 170-20 at 14. And, in light of the undisputed facts as to that individualized process, there is no basis for a reasonable jury to conclude that CSX lacked a good faith belief that Lovelady had misused his FMLA leave based on nothing more than generalized evidence as to CSX's system or process.

Regardless of any perceived imperfections in CSX's FMLA system and investigatory processes (e.g., reliance on statistical evidence, *see, e.g.*, Doc. 172 at 15–16), any proposed alternative, hypothetical system or investigative measures (e.g., curing process, seeking recertification, *see, e.g.*, Doc. 172 at 17–19), and any decision not to investigate and/or pursue dishonesty-based charges against other CSX employees who also may have misused their FMLA leave (e.g., blanket exclusions for employees suffering from cancer or terminal illnesses, *see, e.g.*, Doc. 172 at 19–20), the undisputed evidence—with respect to Lovelady, in particular—remains the same. Indeed, construing the evidence and reasonable inferences in Lovelady's favor, the court must assume that CSX's FMLA system and

investigatory processes were flawed, that hypothetical alternatives would have been better, and that CSX could have pursued dishonesty-based charges and (perhaps) terminated other employees pursuant to its system and processes. But that still does not create any triable fact issue—with respect to Lovelady, in particular—on the question whether CSX honestly believed that Lovelady had misused his FMLA leave.

Again, the undisputed evidence shows the following: that Lovelady twice was warned, in August 2016 and February 2017, about FMLA misuse in connection with several holidays in 2016 and 2017; that, despite the opportunity to do so, Lovelady made no response and gave no explanation; that Lovelady formally was charged with dishonesty-based FMLA misuse in January 2018 in connection with Christmas and other holidays in 2017; that (again), despite the opportunity to do so, Lovelady still gave no explanation; that Lovelady was terminated in February 2018 for dishonesty-based FMLA misuse; and that Lovelady's termination was sustained after a neutral arbitration. *See supra*.

Thus, even assuming generalized, systematic problems in CSX's FMLA "dragnet" (*see, e.g.*, Doc. 172 at 5), there still is no evidentiary basis for a reasonable jury to find or infer that, after CSX's individualized review and investigation, CSX lacked a good faith belief that Lovelady—and, in this case, Lovelady alone—dishonestly misused his FMLA leave. *See Total Sys. Servs.*, 221 F.3d at 1176–77;

*see also Cordoba*, 419 F.3d at 1181 (jury cannot be left to speculate). Given the undisputed facts as to CSX's individualized review and investigation, and without more (i.e., without any explanation from Lovelady or any other evidence specific to Lovelady that CSX lacked a good faith belief as to his dishonesty-based FMLA misuse), any such generalized evidence as to CSX's FMLA system or investigatory processes cannot be "enough evidence for a jury to find for [Lovelady] on the ultimate question of discrimination or retaliation." *Ismael*, 161 F.4th at 763 (citation and quotation marks omitted).

## II. There is no genuine dispute of material fact for trial on Lovelady's FMLA interference claim.

For the same reasons, there is no genuine dispute of material fact for trial on Lovelady's FMLA interference claim. CSX argues that Lovelady's FMLA interference claim "is essentially a repeat of his retaliation claim" (Doc. 169 at 16), and Lovelady agrees that, "under circumstances like those present here, the analysis of FMLA interference and retaliation claims effectively merge" (Doc. 172 at 21). Accordingly, because there is no triable fact issue on Lovelady's retaliation claim, there is no triable issue on his interference claim either.

## CONCLUSION

For the reasons stated above, CSX's summary judgment motion (Doc. 168) is **GRANTED**. Lovelady's claims are **DISMISSED WITH PREJUDICE**.

Separately, the court will enter final judgment.

**DONE** and **ORDERED** this September 30, 2026.

**NICHOLAS A. DANELLA**
UNITED STATES MAGISTRATE JUDGE